**DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA, et al., Petitioners**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent, D. C. Transit System, Inc., Intervenor.**

**DISTRICT OF COLUMBIA, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent, D. C. Transit System, Inc., Intervenor.**

**BLACK UNITED FRONT, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent, D. C. Transit System, Inc., and Washington Construction Area Industry Task Force, Intervenors.**

**Nos. 24398, 24415 and 24428.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1970.

Decided June 28, 1973.

Rehearing Denied Sept. 25, 1973.

District of Columbia at the time the brief was filed, pro se, with whom Louis F. Oberdorfer, Washington, D. C., was on the brief, as amicus curiae.

Before ROBINSON and Mac-KINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

By these three petitions, we are summoned to review aspects of Order No. 1052 [1] of the Washington Metropolitan Area Transit Commission authorizing increases in the fares chargeable by D. C. Transit System, Inc. (Transit) for bus transportation in the District of Columbia and adjacent areas in Maryland and Virginia.[2] Having done so through careful consideration of the parties' contentions and painstaking examination of the administrative record, we find that we must set Order No. 1052 aside and remand the case to the Commission for further proceedings.

In brief summary, our review discloses that in its analysis of Transit's presentation underlying allowance of the increases the Commission mishandled three factors bearing vitally on the propriety of raising the fares. The first of these is the appreciation in market value of certain parcels of unimproved real estate which occurred while they were employed in Transit's operations. The second factor is the efficiency of Transit's service, as to which an investigation is prerequisite to setting higher fares. The final factor is the concept of reasonable rate of return which should have guided the Commission in its fare determinations. We conclude that the Commission did not adequately take into account the first two factors and labored under a misunderstanding of the third.

Landon G. Dowdey, Washington, D. C., with whom S. David Levy and Neil J. Cohen, Washington, D. C., were on the brief, for petitioners in No. 24398.

C. Beldon White, II, Asst. Corp. Counsel, Washington, D. C., for the District of Columbia, with whom Hubert B. Pair, Acting Corp. Counsel, Washington, D. C., at the time the brief was filed, and George F. Donnella, Asst. Corp. Counsel, Washington, D. C., at the time the brief was filed, were on the brief for petitioner in No. 24415.

Jean Camper Cahn, Washington, D. C., for petitioner in No. 24428 and intervenor Washington Construction Area Industry Task Force.

Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Harvey M. Spear, New York City, for intervenor D. C. Transit System, Inc.

Gilbert Hahn, Jr., Washington, D. C., Chairman of the City Council of the

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

1. D. C. Transit Sys., Inc. (Order No. 1052), 85 P.U.R.3d 1 (WMATC 1970).

2. Other aspects of Order No. 1052 came under review by the court in D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 146 U.S.App.D.C. 392, 452 F.2d 1321 (1971), and the order was affirmed in the particulars reviewed therein.

Our opinion is divided into five parts. Part I recites the history and content of Order No. 1052 and the evolution of this litigation. Part II defines the role which value-appreciation of properties in operating status should have played in the fare-setting process under review. Part III concerns the need, which the Commission should have sufficiently met, to evaluate the efficiency of Transit's service in resolving its claim for increased fares. Part IV discusses the concept of reasonable return on a utility's investment as that concept is elucidated in Market Street Railway Company v. Railroad Commission[3] and as the Commission should have applied it when fashioning Order No. 1052. The concluding section, Part V, summarizes our holdings and our directions to the Commission for remedying these defects on remand.

## I. BACKGROUND OF THE LITIGATION

On March 13, 1970, Transit filed new tariffs and an application with the Commission seeking authority to raise certain of its fares for transportation of passengers within the District of Columbia and between the District and points in nearby Maryland and Virginia.[4] In the main, the application requested an increase in the basic District of Columbia and Maryland fares from 32 cents to 40 cents and increments to the Maryland zone fares.[5] In addition to this application, Transit filed a motion for an interim increase in the basis District of Columbia and Maryland fares to 35 cents and slight interim increases in the Maryland zone fares. Transit urged an interim order as a means of lessening its alleged financial difficulties[6] at a date earlier than expiration of the 150-day period legislatively specified and traditionally necessary for processing new fare applications.[7]

Because, in its view, the request for interim relief presented issues essentially identical with and as deserving of public comment as those inherent in the regular application, the Commission decided that the better procedure would be to consider the regular application on an expedited basis,[8] deferring action on the interim motion to such point in the proceedings at which it might become unavoidably required.[9] Accordingly, and

---

3. 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945).

4. See Franchise Act § 7, 70 Stat. 598 (1956); Washington Metropolitan Area Transit Regulation Compact, tit. II, art. XII, §§ 5(a), 6(a) (Transit Regulation Compact), incorporated into Pub.L. No. 86–794, 74 Stat. 1031 (1960), with amendments, appearing as part of Pub.L. No. 87–767, 76 Stat. 765 (1962), set forth following D.C.Code § 1–1410a (1967). Title II of the Transit Regulation Compact is the Washington Metropolitan Area Transit Authority Compact (Transit Authority Compact), which is incorporated into Pub. L. No. 89–774, 80 Stat. 1324 (1966), and is set forth following D.C.Code § 1–1431 (1967). In this opinion we refer to the Transit Regulation Compact and the Transit Authority Compact together as the "Compact." See also D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 151 U.S.App.D.C. 223, 233–234, 466 F.2d 394, 404–405, cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

5. The requested increases are listed in full in Order No. 1052, supra note 1, 85 P.U. R.3d at 4–5.

6. Transit contended that the interim fare increase was necessary to meet a shortage in operating funds, a critical situation which was intensified by the growing insufficiency of existing fares to cover day-to-day expenses.

7. See Compact, supra note 4, tit. II, art. XII, §§ 5(e), 6(a). See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. — at — - —, 485 F.2d 847 at 848–851 (1973); Payne v. Washington Metropolitan Area Transit Comm'n, 134 U.S. App.D.C. 321, 323 n. 3, 415 F.2d 901, 903 n. 3 (1968).

8. D. C. Transit Sys., Inc. (Order No. 1031) (WMATC Mar. 26, 1970) (unreported).

9. Id. The Commission was later to observe that a public hearing on the interim request would have required "due notice to the public," "an adequate period for preparation and presentation of rebuttal

pursuant to the Washington Metropolitan Area Transit Regulation Compact,[10] the Commission suspended Transit's proposed fares[11] and ordered public hearings.[12]

After completion of the hearings, the Commission promulgated Order No. 1052. It found that in the historical twelve-month period immediately preceding November 30, 1969,[13] Transit had a net operating income, after adjustments to operating revenue,[14] of $862,005 which, however, when offset by interest charges of $1,293,651, was transformed into a net loss of $431,646[15] and a reduction of retained earnings to $1,-

241,203.58.[16] The Commission's conclusion that Transit's fares were too low was reached by a series of estimates. It reasoned that if the basic District of Columbia and Maryland fares were maintained at 32 cents, if loss of ridership continued at the rate anticipated by Transit officials,[17] if the Commission staff's projection of income from charter revenues were accepted,[18] if the sum expected by Transit from school subsidies were likewise accepted,[19] if the company's reserve for injuries and damages were increased from $1.3 million to $1.9 million,[20] if maintenance costs were ad-

evidence," and "time for us to deliberate on the questions presented." D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 5. As it turned out, the Commission did not reach the point at which it felt a need for an interim order.

10. See note 4, *supra*.

11. In accordance with the Compact, *supra* note 4, tit. II, art. XII, § 6(a)(1), Transit's proposed tariffs were suspended on March 26, 1970. D. C. Transit Sys., Inc. (Order No. 1031), *supra* note 8. A further suspension was made on April 10, to terminate no later than July 10. D. C. Transit Sys., Inc. (Order No. 1035) (WMATC Apr. 10, 1970) (unreported).

12. D. C. Transit Sys., Inc. (Order No. 1031), *supra* note 8.

13. The twelve-month period ending November 30, 1969, was used as the historical year furnishing the data on which forecasts for the future annual period were based. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 6.

14. The Commission disallowed an unsupported office expense of $6,220.38 and a $10,000 legal fee for non-transit services. *Id.* at 6 n. 1. Total reductions in operating expenses were $24,295.67. *Id.* at 6.

15. *Id.* at 6.

16. *Id.*

17. The Commission customarily gives attention, in forecasting future revenues under raised-fare structures based on past ridership records, to the public's resistance to fare increases. To calculate the ridership figures projected in the instant proceeding, the Commission examined the actual ridership figures for the seven months preceding October, 1969, when Transit had received its last fare increase,

and added thereto the actual ridership figures for the five months following that increase; and to determine the impact of the October, 1969, elevation in fares the Commission applied a .32% resistance factor to those figures. *Id.* at 7. In previous ratemaking proceedings the resistance factor had been estimated at .20% for each 1% increase in fares; in this proceeding the resistance factor was carried upward to .32% for each 1% increase in fares. *Id.* Since the Commission reached a loss-of-ridership figure higher than that calculated by Transit, it chose to accept Transit's figure, reasoning that Transit bore the burden of proving its entitlement to relief and hence the Commission would not ask the public to pay for something that Transit had not asked for. *Id.* at 8. See D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 2, 146 U.S.App.D.C. at 394–395, 452 F.2d at 1323–1324.

18. By annualizing Transit's revenues from charter operations during the three most recent quarters, the Commission arrived at a higher revenue figure than that offered by Transit. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 8–9. See also D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 2, 146 U.S.App.D.C. at 396, 452 F.2d at 1325.

19. Transit's figure of $1,868,633 was accepted over the Commission's figure of $1,772,709 because the company had utilized more current data. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 8.

20. See also D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 2, 146 U.S.App.D.C. at 395–396, 452 F.2d at 1324–1325. To

justed upward by another half-million,[21] if profits of $620,000 were channeled to bus purchases,[22] if management salaries were reduced by $15,000,[23] and if deduction of $526,177.03 for track removal expenses were made,[24] Transit would during the ensuing twelve months lose $2,676,115 which, after inclusion of interest charges, would build up to $3,974,990. "These facts," the Commission declared, "make adjustments in the fares not only necessary, but imperative. . . ." [25]

The Commission then turned to the question of the fares to be allowed. It found that if the fares proposed by Transit were inaugurated, they would generate net operating income of $2,440,284.[26] Interest expenses of $1,198,875 were projected, to which the Commission added new interest charges of $234,263 incidental to bus purchases and $100,000 to meet interest payments on a $1 million loan acquired to settle Transit's debt to its employees' pension fund.[27] After payment of the aggregate interest cost of $1,533,138, then, there would be a dollar return of $907,146, or a return on equity of 52.10 percent; [28] and with the required purchase of 85 buses, the rate of return on operating revenue would be 7 percent, an operating ratio of 107 percent.[29] Since the rate of return had been thoroughly discussed at two recent fare proceedings,[30] the Commission considered that new testimony thereon was unnecessary, so instead it stipulated that official notice of all rate-of-return testimony in those proceedings would be taken.[31]

The Commission noted that the projected return would theoretically permit payment of a dividend which would probably attract investors, but admonished that, given the record of operating losses which Transit had incurred in past years, it would be imprudent to distribute any of the return to Transit's investors.[32] It was the Commission's expectation, rather, "that the cash flow represented by return on equity would, for the time being, be used in the com-

---

insure that monies to accommodate claims for injuries and damages would be available, the Commission required that 70% of the $1.9 million allowed as an expense be funded at the rate of $110,833 per month. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 11.

21. Transit requested an additional $474,073 and the Commission allowed $517,200, to be placed in escrow pending expenditure for the purpose intended. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 11–12. The difference is explained by payroll fringe costs. *Id.* at 12.

22. This would enable resumption of a bus-purchase program which had been temporarily suspended in D. C. Transit Sys., Inc. (Order No. 984), 81 P.U.R.3d 417, 454 (WMATC 1969).

23. Salary increases of $5,000 to each of three senior officers were disallowed. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 13 n. 6.

24. The District of Columbia Department of Highways and Traffic estimated what the expenses would be during the future annual period. *Id.* at 13–14. The Commission believed that this cost should be borne by the community at large rather than by the riders, but included it as a cost of service since it was improbable that Congress would assume it. *Id.* at 14.

25. *Id.* So, although particular items of expense and revenue were disputed, both the Commission and Transit agreed that Transit would not receive sufficient revenues under the existing fares even to cover operating expenses. *Id.*

26. *Id.* at 16.

27. *Id.*

28. *Id.* at 16–17.

29. *Id.* at 15.

30. D. C. Transit Sys., Inc. (Order No. 880) (WMATC Oct. 18, 1968) (unreported), at 23–36; D. C. Transit Sys., Inc. (Order No. 984), *supra* note 22, 81 P.U.R.3d at 428–34.

31. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 15.

32. *Id.* at 16. Transit is the wholly-owned subsidiary of another corporation, but we refer throughout this opinion to Transit's "investors" for the sake of convenience in discussing the relevant ratemaking principles.

pany's financial recovery, rather than for the payment of dividends."[33] This return, the Commission felt, would provide the internally-generated capital needed to meet down payments on new buses, improve Transit's credit—thereby facilitating other purchases of new equipment—and aid in settling some of Transit's current liabilities of more than $10 million.[34] In the opinion of the Commission, the return allowed would thus contribute to the company's recovery without imposing an undue burden on the fare-paying public.[35] The increases, the Commission thought, would be sufficient to offset reduction in ridership which the company may not have adequately taken into account,[36] and to permit the inauguration of reduced fares in off-peak hours for senior citizens.[37]

By the Commission's estimate, the new fare structure would produce an abnormally high return on equity of 52.10 percent.[38] Adverting to that fact, the Commission observed:

> This figure must be carefully assessed. The losses incurred by the company in recent years have reduced retained earnings from $2,890,848 in 1966 to $1,241,204 as of November 30, 1969. Were it not for special adjustments to retained earnings in the net amount of $605,008 during the past three years, the balance in retained earnings account would have stood at $636,196.

> We believe that this factor must be heavily weighed in considering the significance of the percentage return on equity. In these circumstances, the percentage return is an unreliable indicator of adequacy. The central fact is that the dollar return which is our target has remained essentially the same for several years. Circumstances have prevented the company from earning that return, with a consequent effect on the level of retained earnings. We believe that the factors which made the dollar level appropriate at a time when those dollars meant 38.54 per cent return on equity are equally valid today. Thus, since we are allowing a dollar return on equity which is only slightly higher than the levels we have found to be reasonable in other recent orders, and since we think that there are sound reasons for that slight extra allowance in this proceeding, we do not regard the percentage return on equity which that dollar return now represents as being an obstacle to our allowance here.[39]

The Commission did, to some extent at least, take into consideration alternatives to raising the fares. One such alternative was the possibility of cost reductions through service cutbacks. Testimony adduced at the hearings indicated that to offset the increase which the Commission felt necessary, a service cutback of approximately 16 percent would be required, and that, the Commission said, "would mean tremendous reductions in service."[40] The alternative most attractive to Commission members —a federal appropriation—was deemed most unlikely in view of the fact that Congress traditionally linked federal non-school subsidies for transit in the District of Columbia to public ownership of the transit operation.[41] In any event, the Commission believed that it was without power to stay the fare raises until such time as legislation for public acquisition might be enacted. "Both the Compact and the case law," said the Commission, "require us to supply sufficient revenues so that the Company can recover its expenses and have an ade-

---

33. *Id.*

34. *Id.* at 15–17.

35. *Id.*

36. See note 20, *supra.*

37. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 17.

38. *Id.*

39. *Id.* at 17–18.

40. *Id.* at 26–27.

41. *Id.* at 26.

quate return." [42] And, the Commission added, "[w]e think that subjecting the community to the reality, or even the substantial risk, of a cessation of service would not be in the public interest, even for a laudable goal of achieving legislation which would alleviate the problem of rising fares." [43] Thus, although, as the Commission recognized, a 25 percent increase in the basis fares would impose a tremendous hardship upon the poor, the Commission reasoned that the public interest would be ill-served by fares which threatened to put a stop to transit service altogether.[44]

Order No. 1052 authorizing the increases was released on June 26, 1970, and was scheduled to take effect at 12:01 a. m. on June 28.[45] On June 27, however, we stayed operation of the order pending disposition by the Commission of applications for reconsideration tendered by petitioners.[46] On July 1, 1970, the Commission issued Order No. 1057 by which it denied reconsideration for the asserted reason that no new grounds warranting a different order

were advanced.[47] The Commission opined that all ramifications of relevant public interest had already been adequately examined as required by Section 6(a)(3) of the Compact.[48] Those considerations were not reflected dollarwise, however, in the final determination because the Commission believed that when Section 6(a)(3) was read in conjunction with Section 6(a)(4),[49] Transit was entitled to a tariff structure which would enable it to meet its expenses and provide a fair return to its investors.[50] The Commission felt that since the record contained no facts suggesting that Transit's management was inefficient or dishonest, a diminished return was not justified on a theory of uneconomical operation.[51] In the Commission's view, the rate of return which it had approved was fair and roughly equivalent, despite its exceedingly high percentage of investors' equity,[52] to margins of profit allowed and held lawful in previous fare cases.[53] Further delay in instituting the new fares pending the outcome of further litigation

42. *Id.* at 25–26.

43. *Id.* at 26.

44. *Id.*

45. The fare changes authorized by Order No. 1052 are omitted from the published report. *Id.* at 29. They do appear in the record before us. Proposed increases were allowed for token cost, interline fare, D. C. Stadium fare and Capitol Hill express fare—all in the District of Columbia —and in the Virginia interstate zone fare. Proposed increases were modified and allowed for Maryland zone fares, District of Columbia-Maryland interstate local fares, and District of Columbia-Maryland interstate express fares. A proposed increase for the minibus fare was disallowed. See D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 2, 146 U.S.App.D.C. at 396, 452 F.2d at 1325.

46. Black United Front v. Washington Metropolitan Area Transit Comm'n, 141 U.S. App.D.C. 73, 79, 436 F.2d 227, 233 (1970).

47. D. C. Transit Sys., Inc. (Order No. 1057), 85 P.U.R.3d 33 (WMATC 1970).

48. Compact, *supra* note 4, tit. II, art. XII, § 6(a)(3), quoted in text *infra* at note 129.

49. The Compact, *supra* note 4, provides at tit. II, art. XII § 6(a)(4):
   It is hereby declared as a matter of legislative policy that in order to assure the Metropolitan District of an adequate transportation system operating as private enterprises the carriers therein, in accordance with standards and rules prescribed by the Commission, should be afforded the opportunity of earning such return as to make the carriers attractive investments to private investors. As an incident thereto, the opportunity to earn a return of at least 6½ per centum net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on gross operating revenues, shall not be considered unreasonable.

50. D. C. Transit Sys., Inc. (Order No. 1057), *supra* note 47, 85 P.U.R.3d at 38–39.

51. *Id.* at 37.

52. *Id.* at 39–40.

53. *Id.*

was rejected as directly contrary to the Compact's proscription of administrative suspensions of fare tariffs for a period of more than 150 days.[54] The Commission reiterated that in Order No. 1052, as in previous orders, it had recognized the socio-economic hardship which a fare increase would precipitate, but that, absent congressional action, revenues would have to be produced through larger fares in order to offset Transit's rising expenses, including particularly its growing labor costs.[55] The effective date of Order No. 1052 was reset—July 11, 1970, at 12:01 a. m.—and subsequent petitions for reconsideration were denied.[56]

Upon the filing of the petitions in this court, petitioners moved for a stay of Order No. 1052 pending judicial review. On balance of the competing considerations in light of the criteria guiding action on such applications, that motion was denied on July 10, 1970.[57] Now, of course, Order No. 1052 is before us for a full examination on the merits, and to that task we proceed.

## II. APPRECIATION IN LAND VALUES

A major contention advanced by some petitioners,[58] similar to the one tendered in Democratic Central Committee v. Washington Metropolitan Area Transit Commission,[59] decided today, is that in passing on Transit's application for higher fares, the Commission should have considered the appreciation in the value of certain of Transit's landholdings occurring while the lands were in service and prior to their transfer from operating to nonoperating status. A related contention [60] is that in revising Transit's fares, the Commission improperly ignored income which Transit had received from its subsidiaries, to some of which certain of the nonoperating properties had been conveyed.[61] The Commission and Transit vigorously oppose both arguments on the merits. Transit urges additionally that neither argument was made to the Commission as a ground for reconsidering Order No. 1052, and that for that reason neither can now be made a subject of judicial review.[62] We examine first the jurisdictional challenge.

### A. *Jurisdiction to Consider*

By the terms of the Compact,[63] anyone affected by a final Commission order may seek its reconsideration, in whole or in part.[64] This can be done by "an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors

---

54. *Id.* at 41.

55. *Id.* at 37, 42.

56. D. C. Transit Sys., Inc. (Order No. 1062) (WMATC July 8, 1970) (unreported) ; D. C. Transit Sys., Inc. (Order No. 1066) (WMATC July 13, 1970) (unreported) ; D. C. Transit Sys., Inc. (Order No. 1067) (WMATC July 14, 1970) (unreported) ; D. C. Transit Sys., Inc. (Order No. 1074) (WMATC July 24, 1970) (unreported) ; D. C. Transit Sys., Inc. (Order No. 1090), 85 P.U.R.3d 508 (WMATC 1970).

57. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 141 U.S.App.D.C. 79, 83, 436 F.2d 233, 237 (1970).

58. Petitioners in Nos. 24,398 and 24,428.

59. No. 21,865, 158 U.S.App.D.C. ——, 485 F.2d 786 (1973).

60. Presented only by petitioner in No. 24,-428.

61. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, at app.

62. See note 64, *infra.*

63. *Supra* note 4.

64. "Any person affected by any final order or decision of the Commission may, within thirty days after the publication thereof, file with the Commission an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors claimed as grounds for such reconsideration. No person shall in any court urge or rely on any ground not so set forth in such application." Compact, *supra* note 4, tit. II, art. XII, § 16.

claimed as grounds for such reconsideration." [65] The Compact expressly provides, however, that "[n]o person shall in any court urge or rely on any ground not so set forth in such application." [66] Only recently we had occasion to advert to these provisions and the policy underlying them,[67] and even today we have occasion to apply them.[68] It is Transit's position that both of the aforesaid contentions are thus intercepted.

Following the issuance of Order No. 1052, each of the petitioners presented to the Commission one or more applications for reconsideration. Only one,[69] however, in any way mentioned land transfers as a ground for disturbing the order. That was a request that the Commission vacate Order No. 1052 and postpone further consideration of a fare increase until final determination by this court, in *Democratic Central Committee*,[70] of the credit properly to be allowed bus riders for the appreciation in value of Transit's "land" withdrawn from public use.

■ While, to be sure, this assignment of error might have been drawn more artfully, we deem it sufficient to preserve the point for judicial review. It sets forth, though succinctly, the kernel of the complaint, and the reference to *Democratic Central Committee,* then fully briefed and awaiting oral argument in this court, makes the scope and content of the complaint unmistakable. For, as today's opinion in that case discloses, the only viable issue there is the allocation, as between Transit's investors and its farepayers, of the appreciation in value of properties while used in its operations.[71] The Commission does not suggest that it misunderstood the thrust of this assignment,[72] nor do we see how it could.[73] We conclude that the issue of participation by Transit's consumers in value-appreciation of transferred land [74] is properly presented for review.[75]

■ Transit's other position—as to the propriety of our review of the Commission's failure to include income from its subsidiaries in its computation of the new fares—rests, however, on solid

65. See note 64, *supra.*

66. See note 64, *supra.*

67. D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 242–243, 466 F.2d at 413–414.

68. Powell v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. —— at —— nn. 39–41, 485 F.2d 1080 at 1086 nn. 39–41 (1973).

69. Petitioner in No. 24,398.

70. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59.

71. See *id.* at 896. See also note 74, *infra.*

72. The Commission poses no objection whatsoever to consideration of the value-appreciation issue on this review.

73. In D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, we pointed out that the principal consideration underlying the requirement that issues first be presented for Commission reconsideration "is the opportunity, through precise identification of the errors alleged, for administrative re-

examination and correction prior to judicial intervention in the regulatory process." 151 U.S.App.D.C. at 242, 466 F.2d at 413 (footnote omitted).

74. The only question of value-appreciation raised for Commission reconsideration or briefed here pertains to *land.* The issue before us here is accordingly so limited. See text *supra* at notes 69–71. See also Powell v. Washington Metropolitan Area Transit Comm'n, *supra,* 158 U.S.App.D.C. at ——, 485 F.2d at 893–894 note 68; Democratic Cent. Comm'n v. Washington Metropolitan Area Transit Comm'n, *supra,* 158 U.S.App.D.C. at ——, 485 F.2d at 795 note 59; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App. D.C. at 242–243, 466 F.2d at 413–414. It is thus narrower than the issue in *Democratic Central Committee,* which extends to depreciable as well as nondepreciable property.

75. Compare Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S. App.D.C. 342, 374 n. 181, 415 F.2d 922, 954 n. 181 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

ground. Nowhere in the several applications for Commission reconsideration in the record before us are we able to discern anything "stating specifically" [76]—or otherwise—that particular objection as a basis for reexamining Order No. 1052. Indeed, none of the petitioners has even responded to Transit's argument that the issue of income from subsidiaries cannot now be raised here. For the omission of a step essential to our jurisdiction, we hold that that issue is not open on this review.[77]

## B. *The Issue on the Merits*

Having confirmed our jurisdiction to review the question of allocation of the in-service value-appreciation in lands withdrawn from operations by Transit, we proceed to deal with the issue on the merits. In considering Bebchick v. Washington Metropolitan Area Transit Commission[78] and Democratic Central Committee v. Washington Metropolitan Area Transit Commission,[79] both decided today, we pointed out that Transit has, since 1956, transferred certain properties, which it had acquired from its predecessor, out of operating status—"below the line," in the convenient shorthand expression[80]—and we hold in *Bebchick* that, at least for the depreciable part of those withdrawn assets, the difference in value between the book figure

at which the items were transferred and their fair market value at the time of transfer should be considered reimbursement to Transit's investors for the depreciation deficiency with which *Bebchick* was concerned.[81] In *Democratic Central Committee,* we treat both the depreciable and the nondepreciable portions of the transferred assets, and conclude that gains from the appreciation in value of either should have been credited to Transit's farepayers[82]—except, of course, for those gains which *Bebchick* requires as compensation to Transit's investors for the aforementioned depreciation deficiency.[83]

As we have said, the issue in the present cases can extend no further than value-appreciation of land,[84] and the extent to which in-service appreciation of Transit's below-the-line lands may be depleted by the response to today's holding in *Democratic Central Committee* cannot be pin-pointed at the moment. But since we cannot assume that proper handling of the problem in *Democratic Central Committee,* when that litigation was before the Commission, would have completely exhausted the in-service appreciation of Transit's lands now held below the line, it is appropriate to inquire, at the instance of some of the petitioners, whether Order No. 1052 is invalid for failure to take the residue of such appreciation into account.

76. No explanation for not presenting the point to the Commission being offered, we do not confront the question whether the Compact requirement, see note 64, *supra,* relaxes in extraordinary circumstances.

77. See Powell v. Washington Metropolitan Area Transit Comm'n, *supra* 158 U.S.App. D.C. at ——, 485 F.2d at 893–894 note 68; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 242–243, 466 F.2d at 413–414. See also FPC v. Colorado Interstate Gas Co., 348 U.S. 492, 501, 75 S.Ct. 467, 99 L.Ed. 583 (1955); Granite City v. Illinois Commerce Comm'n, 407 Ill. 245, 95 N.E.2d 371, 374 (1950).

78. 158 U.S.App.D.C. ——, 485 F.2d 858 (1973).

79. *Supra* note 59.

80. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, at app., for a list of the transferred properties.

81. Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 78, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 875–876.

82. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 821–822.

83. See Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 78, 158 U.S.App.D.C. at ——, 485 F.2d at 880.

84. See note 74, *supra,* and accompanying text.

There can be no doubt as to the answer to that question. The discussion in *Democratic Central Committee* and its amplification in *Bebchick* make plain the Commission's obligation to consider appreciation-allocation when it undertook to revise transit fares. In the proceeding under review, we have held that this responsibility, as respects land appreciation, was suitably invoked,[85] but it is evident that in no way was it discharged. Indeed, nowhere in Order No. 1052 nor in any of the several orders denying its reconsideration is the problem even mentioned. We hold, then, that as a result of this omission, Order No. 1052 is fatally defective.[86]

In lieu of another discourse on the problem here, it suffices to refer our readers to the comprehensive treatment in *Democratic Central Committee*. Made here, however, are additional arguments by which Transit and the Commission endeavor to support this aspect of Order No. 1052, and we will comment specifically on these. What follows is some elaboration on points encompassed within the much broader discussion in *Democratic Central Committee*.

The Commission's position has continued to be that an increase in the value of nondepreciable property—land in this instance—dropped below the line belongs entirely to investors, and that consumers have no right to that gain or any share in it.[87] We reiterate our assertion in *Democratic Central Committee* that we find no basis in regulatory law or logic for this absolute principle, to which the Commission mechanically adheres.[88] The agency's theory is that, since the farepayers did not contribute to the cost of such property through absorption of depreciation charges, they ought not to participate in any profit, which should go solely to the investors, who alone have borne the capital cost of the asset.[89] The Commission stresses, too, that if there had been a decrease in the value of this real estate, the consumers would not have borne any part of the loss, nor would they have been expected to, under the accounting system followed by the Commission.[90] Whatever may be the merit of that overall position in other circumstances, for other pieces of property or for other companies, there are a number of reasons—some articulated in *Democratic Central Committee*,[91] and some here—why we do not think it is appropriate for this utility and for the particular assets we are now considering.

To begin with, we do not share the Commission's theory that simply by virtue of having paid the cost of an asset, Transit's investors are automatically entitled to the gain in its market value. As we point out in *Democratic Central Committee*, this correlation between ownership of the asset and entitlement to its value-appreciation has faded with the demise of fair value as the standard for setting either a rate or a depreciation base.[92] The viable concept today is that "the investor's legally protected interest resides in the capital he invests in the utility rather than in the items of property which that capital purchases for provision of utility service."[93] That thesis refutes the notion that investors inexorably become entitled to appreciation in value of operating assets as inseparable and inviolable incidents of their investments.[94]

The investment-in-capital concept has particular relevance to Transit's circumstances in view of the fact that these

85. See text *supra* at notes 69–75.

86. We deal with the consequences of this holding in Part V, *infra*.

87. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 798–800, 818.

88. *Id.* at —— – ——, —— – ——, 485 F.2d at 800, 820–821.

89. Compare *id.* at —— – ——, 485 F.2d at 798–800.

90. But see *id.* at ——, 485 F.2d at 811.

91. *Id.* at pt. IV(B).

92. *Id.* at pt. III.

93. *Id.* at ——, 485 F.2d at 801.

94. *Id.* at —— – ——, 485 F.2d at 802–803.

were not properties added to the existing transportation system in the District of Columbia by Transit out of its own assets or acquisitions. Rather, Transit acquired them, as integral parts of the District's transit system, in 1956 from Capital Transit Company at the time the former received the franchise.[95] Thus, it is evident that we are not dealing with the same kind of situation, as the Commission seemingly supposed, that would have existed had the properties been originally purchased outright by Transit's investors with a view to deployment as they pleased. What the investors bought was an ongoing mass-transportation system with physical components, including the lands in question, long since dedicated to public service. We do not mean to imply that had that not been the case, value-appreciations would necessarily have been immune to claims of farepayers. We do say that since that was the case, it makes those appreciations more susceptible to those claims.

When it gave Transit the franchise, Congress knew that these properties were being taken over from the predecessor operator,[96] and Congress also knew that Transit paid Capital some $10 million less than the net original cost to Capital—some $10 million less than the book value at which these items were transferred below the line Congress knew, too—because that was a requirement of the franchise—that Transit would have to convert from a bus-and-trolley operation to an all-bus system,[97] and that a good part of these same properties would, as a consequence, no longer be needed for transportation purposes. And Congress must have known—this was common knowledge—that there was no real possibility that the value of these pieces of land would decline below book value.[98] On the contrary, the known fact was that they had already increased in worth, and the very high probability was that they would continue to do so, or at least would not suddenly decline below the 1956 book value.

Nothing in the Franchise Act[99] nor its historical context, then, suggests that Congress intended that Transit's investors would automatically pocket, at the expense of the farepayers, the expectable increment in value which had and would come to properties forming an integral part of the existing transit system in 1956, and which would necessarily and shortly become nonoperating in large part as a result of the mandatory dropping of the trolley service. Under such conditions, we cannot believe that Congress contemplated such an outright gift to Transit's investors, who would not have done anything to earn or deserve it, nor would they have borne any risk of loss on those pieces of land. It is not sensible to suppose that a Congress intent on fair terms for the farepayer contemplated such a bonanza. Congress did give certain advantages to Transit—with respect to taxes, for instance[100]—but we cannot see that an

---

95. The history of Transit's acquisition of Capital's assets is detailed in *id.* at 811–814.

96. Franchise Act, Pub.L. No. 757, 70 Stat. 598, 604 (1956), tit. II, §§ 201(a), 202, 203. See also H.R.Rep.No.2751, 84th Cong., 2d Sess. 11, 17 (1956).

97. Franchise Act, Pub.L. No. 757, 70 Stat. 598, 599 (1956), tit. I, pt. 1, § 7. For a more detailed discussion of the conversion requirement, see Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 812–814.

98. As the Commission tells us,

    . . . by any realistic view of the actual situation at Transit, its real estate holdings will not decrease in value below original cost, *nor was there ever any risk that they would do so.*

    Brief for Respondent at 13, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59 (emphasis added). And see the discussion in that case at —— – ——, 485 F.2d at 812–814.

99. Pub.L. No. 757, 70 Stat. 598 (1956).

100. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— n. 273, 485 F.2d at 816 n. 273.

automatic right to this increase was one of them. On the contrary, we think it rather obvious that as to these properties the Commission was left the responsibility of determining what should properly be done with the increase in value, and that it could not mechanically or rigidly follow some assumed general rule plainly inappropriate to these specific circumstances.

It is said, however, that it would be unfair to Transit to force it to share or to pass on this gain when it could not, under the Commission's system of accounts, receive reimbursement from the riding public for a decrease in the value of the properties. We are not nearly so confident that utility investors cannot recoup capital losses on nondepreciable assets where they are actually sustained,[101] but we need not debate the point. For, as we have pointed out,[102] the consideration that the lands in question might have fallen in value during the period of Transit's franchise is wholly illusory. From the beginning, there was never any real risk of such a loss to Transit, only the probability of a profit. In that situation, it cannot be the law that Transit's right to retain the profit flows from the absence of formal inclusion by the Commission in its uniform system of accounts of a provision that the farepayers would bear or share in such a loss—that the consumers would be entitled if the accounting system so provided, but not if such a clause were omitted. Since the inclusion or non-inclusion of that provision would in all events be wholly academic and nonoperative for these particular properties, to make the issue turn on that technical point would be in effect to give the Commission *carte blanche* arbitrarily to

hand over the gain to Transit, or to deny it in advance, without consideration of the substantive merits or demerits of what it was doing.[103] There being no real possibility of loss, the Commission could not justly say, if it omitted a provision for the consumers to carry the loss, that the company was entitled to the gain because it alone shouldered the nonexistent risk of loss. Conversely, if the agency did happen to incorporate such a provision in its system of accounts, it could not justly say that because of that fact alone, the consumers should receive the profits because they would bear the nonexistent risk of loss. With respect to these specific properties, because of the special circumstances to which we have referred, no proper judgment could be made on that unrealistic basis.

In *Democratic Central Committee*,[104] we discuss at some length the principle —applied in that case—that benefit should follow burden, and gain should follow risk of loss.[105] But the foregoing discussion here illustrates the limits to that principle where, as a practical fact of the matter, there is no risk of loss. What the Commission was called upon to do here, and what it utterly failed to do, was to exercise its judgment instead of blindly applying a rule inappropriate to the situation presented. The only sound foundation for such a judgment, we think, is to look to see whether it would be fair, in the total situation, to save this gain wholly for the investors—and, if not, what proportion should be passed on to the farepayers, and in what form and at what time.[106] In other words, the problem was one for the exercise of informed reason and discretion on the specific and individual facts and circumstances.[107]

101. See *id.* at ——, 485 F.2d at 821–822.

102. See text *supra* at note 98.

103. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 818–821.

104. *Supra* note 59.

105. *Id.* at —— – ——, 485 F.2d at 806–811.

106. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 820–822.

107. *Id.* at ——, 485 F.2d at 820–821.

This court has taken this approach in similar cases,[108] and there is no good reason for failing to utilize it here.

We may briefly consider three other objections to rejecting the rule that investors are automatically entitled to retain all the gain on the land transferred out of operations. The first is that investors had the right to believe that they would be able to keep these profits, and that is unjust now to act against that assumption. We think, however, that no such belief was warranted. As we have said, the Franchise Act, correctly interpreted, gives no foundation for that belief with respect to these properties.[109] Insofar as there may be a rule of thumb allocating to the investors both gain or loss on such nondepreciable assets, there is no showing that such a rule has been mechanically applied where, as here, there is no risk of loss at all but only of gain.[110] Even the course of regulation by this Commission and its predecessor would not give adequate footing for the assumption. Though it dealt with different facets of the same general problem, our opinion in Washington Gas Light Company v. Baker,[111] decided in 1950 before Transit received its franchise, alerted all those concerned with utility regulation in the District of Columbia that the realities of the particular situation would govern, not formal rules of principles applied in a vacuum.[112] That was also the attitude of the regulatory agencies and of this court in other cases.[113]

Acting on that very basis, this Commission in 1966 adopted Regulation 61 treating of gain on depreciable property put below the line and discussed in detail in our opinion in *Bebchick*.[114] That regulation provides that when depreciable property is transferred below the line, the company must file a fair market valuation of the property, and the excess of fair market value, determined by appraisal, over the unrecovered cost must be deducted from the depreciation expense in the transfer years, so that the farepayers will receive the benefit of the increase in value.[115] We are not advised of any prior rule or regulation of the Commission or its predecessor agency governing specifically the allocation of property value appreciations as between investors and consumers.[116] There was no such promise, then, in 1956, or at the time these properties were put below the line, that gain on land placed in nonoperating status would go automatically to the investors.

■ Next there is the argument, also discussed in *Bebchick*, that nothing can possibly be done about the gain until there is an actual sale or disposition. Aside from the fact that the properties in question have now been disposed of, albeit involuntarily,[117] most of the rea-

108. See, e. g., D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 121 U.S.App.D.C. 375, 397–398, 350 F.2d 753, 775–776 (en banc 1965); D.C. Transit Sys., Inc. v. Public Utils. Comm'n, 110 U.S.App.D.C. 241, 242, 292 F.2d 734, 735 (1961); Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 118–119, 188 F.2d 11, 14–15, cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L. Ed. 686 (1950).

109. See text *supra* at notes 99–100.

110. See the discussion in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S. App.D.C. at ── ─ ──, ── ─ ──, ──, 485 F.2d at 795–800, 806–808, 811.

111. *Supra* note 108.

112. *Id.* 88 U.S.App.D.C. at 118–119, 188 F.2d at 14–15.

113. *See* D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 108, 121 U.S.App.D.C. at 397–398, 350 F.2d at 775–776; D.C. Transit Sys., Inc. v. Public Utils. Comm'n, *supra* note 108, 110 U.S.App.D.C. at 242, 292 F.2d at 735.

114. *Supra* note 78, 158 U.S.App.D.C. at ── ─ ──, 485 F.2d at 871–873.

115. *Id.* ── U.S.App.D.C. at ── n. 112, 485 F.2d at 872 n. 112.

116. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at ── ─ ──, 485 F.2d at 818–819.

117. Pursuant to the National Capital Area Transit Act of 1972, Pub.L. No. 92–517, 86 Stat. 999 (1972), the company's transportation operations and operating assets were taken over by the Washington

sons given in *Bebchick* for turning down that unqualified position[118] likewise apply with equal force here. In particular, the same grounds which moved the Commission to adopt Regulation 61 for depreciable property pertain as well to these below-the-line land properties. Though the Commission might, on a proper showing, have decided that this gain in land value should not be utilized for ratemaking purposes until it was actually realized by the investors, the agency could not refuse, simply because of lack of realization, to consider the possibility of using the profit before that time.[119]

■ Finally, we do not think that it would be a denial of due process or of just compensation to require, in proper circumstances, that all or some of the gain from these properties be passed on to the riders, any more than Regulation 61 is unconstitutional with respect to depreciable property.[120] In the special situation in which these pieces of real estate were acquired by Transit in 1956, Congress could have said explicitly, when it granted the franchise, that gain accrued and accruing on them would not necessarily redound to the investors'

benefit. That would certainly have been a reasonable legislative requirement,[121] and the fact that Congress did not state it does not make it any less reasonable. In view of the special situation of these properties, we need not consider whether the same principle would control for other assets not acquired in comparable circumstances.

■ Resting as it does solely upon considerations we have rejected as reasons for holding that investors are entitled to all the gain on the transferred properties, the Commission has failed to address itself, under the correct standards to the problem of how this gain should be used. Order No. 1052 is therefore invalid on this ground, in addition to others which we later discuss.[122] We hold today in *Democratic Central Committee* [123] that the appreciation in the value of Transit's assets—depreciable and nondepreciable—when moved into nonoperating status must be credited to the benefit of the bus riders.[124] Our holding in the cases at bar, though necessarily narrower,[125] adheres firmly to that decision. Moreover, since the Commission's failure to do that in formulating Order No. 1052 cannot be

Metropolitan Area Transit Authority on January 14, 1973. The purchase price is being determined in condemnation proceedings initiated by the Transit Authority. See *id.* at 86–88.

118. See Bebchick v. Washington Metropolitan Area Transit Comm'n, *supra* note 78, 158 U.S.App.D.C. at — – —, 485 F.2d at 873–874.

119. We hold today in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S. App.D.C. at —, 485 F.2d at 822, that the value appreciations of depreciable and nondepreciable. assets should there have been credited to bus riders in fare-setting proceedings following the removal of those assets from operation *prior* to realization of any actual gain by Transit from their sale.

120. The point on constitutionality is raised only by Transit.

121. As we point out in No. 21,865, Democratic Cent. Comm. v. Washington Metro-

politan Area Transit Comm'n, *supra* note 59, with the end of the fair value standard for computing rate base and depreciation, it can no longer be argued that investors possess an inalienable claim to value appreciations accruing to in-service utility assets. *Id.* at Part II. The allocation of such gain must be resolved by balancing the respective risks, benefits and burdens of investors and consumers. *Id.* at notes 183–186. A careful study of the history of Transit's operating franchise demonstrates that an equitable balance here would pass that gain on to the riders. *Id.* at Part IV(B). Hence, a legislative determination that the increased value of these lands should not necessarily benefit Transit's stockholders would have been eminently reasonable.

122. See Parts III–IV, *infra*.

123. *Supra* note 59.

124. *Id.* at —, 485 F.2d at 822.

125. See note 74, *supra*.

cured by retroactive ratemaking[126]— particularly in light of the recent public takeover of Transit[127]—it is left to implement the restitutionary remedy which we hereinafter describe more fully in our consideration of the disposition to be made.[128]

## III. EFFICIENCY OF MANAGEMENT

We turn now to the question whether the Commission adequately considered the level of efficiency of Transit's management in determining its right to the fare increase granted in Order No. 1052. All petitioners contend that the order must be set aside because the Commission did not follow the command of Section 6(a)(3) of the Compact, which provides:

In the exercise of its power to prescribe just and reasonable fares and regulations and practices relating thereto, the Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable such carriers, under honest, economical, and efficient management, to provide such service.[129]

In particular, petitioners say that the Commission failed to "give due consideration" to the efficiency of Transit's management. The Commission, and Transit, stand on what was said in its fare orders themselves. There the Commission refused to make any findings on efficiency, or to give it any weight in reaching its decision, because, it said, "neither [the Commission's] staff nor the protestants have presented facts indicating that the company's basic problems lie in adequate management." [130] We hold that in failing to investigate the caliber of the company's management on the ground that the formal parties had not produced evidence of bad management, the Commission violated the Compact. But since there is no need to do so, we do not decide whether this error, standing alone, would require setting aside Order No. 1052.[131]

Simply reading Section 6(a)(3) makes clear that in setting transit fares the Commission was obligated to consider, among other factors, the efficiency of the carrier's management. The criteria by which efficiency was to be measured, and the weight to be given it as a factor, lay, of course, within the judgment of

126. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— —— ——, 485 F.2d at 823–824; Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 75, 134 U.S.App.D.C. at 360–361, 415 F.2d at 940–941.

127. See note 117, *supra*.

128. See Part V, *infra*.

129. Compact, *supra* note 4, tit. II, art. XII, § 6(a)(3).

130. D.C. Transit Sys., Inc. (Order No. 1057), *supra* note 47, 85 P.U.R.3d at 37, denying reconsideration of D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 1. There is no discussion in Order No. 1052 itself concerning efficiency or any

of the Section 6(a)(3) factors. That is because, as the Commission explained, it had given its view of this problem in D.C. Transit Sys., Inc. (Order No. 984), *supra* note 22, just eight months before. Indeed, the discussion in Order No. 1057 is, by the Commission's own statement, taken virtually *in haec verba* from Order No. 984. The amicus curiae suggests that this heavy reliance on a prior order, and the record which underlay it, was improper. Our resolution of the efficiency issue renders unnecessary any expression of opinion on that point.

131. Compare Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 7, 134 U.S.App.D.C. at 338–342, 415 F. 2d at 918–922.

the Commission in the first instance.[132] But the Compact required that efficiency be duly considered,[133] and the Commission obviously did not take efficiency into account at all when it set fares in Order No. 1052.[134] The reason given for this failure was that neither the staff nor the protestants brought forward evidence of mismanagement at the hearings. This reason is insufficient. The Commission cannot be said to have given "due consideration" to the efficiency factors where, as here, it declares that it would not consider it, and in any event there is so little evidence in the record that the Commission could not make any relevant findings.

The role of efficient management in Commission decisions in fare-increase applications was delineated in D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,[135] the most recent pronouncement of this court on that subject. There we were called upon by Transit to review the Commission's denial in Order No. 1216 [136] of Transit's request for a fare raise. Underlying Order No. 1216 was an extensive study of Transit's operations and financial condition carried out by a consultant employed by the Commission for that purpose.[137] On the basis of the consultant's report, the Commission concluded that Transit's seriously unstable and risky financial situation bred such an uneconomical and inefficient transportation operation[138] that merely to increase fares would not cure either of those conditions.[139] The Commission, on that basis, denied Transit's proposed increase, and held that a prerequisite to any future elevation in fares was Transit's compliance with a group of Commission directives aimed at putting the company's financial house in order.[140]

On review of Order No. 1216, we upheld the Commission's findings and conclusions, and affirmed its refusal to revise the fares.[141] We found the Commission's view, as articulated in Order No. 1216—that it was required by the Compact to consider and weigh the interests of the public, including the public's right to economical, efficient and adequate transportation service [142]—to

---

132. The Commission did not indicate in either Order No. 1057 or Order No. 984 how it would judge efficiency, or what weight it would give it in deciding on the proper fares. Compare D.C. Transit Sys., Inc. (Order No. 1216) (WMATC May 19, 1972) (not yet reported), at 9–12.

133. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, supra note 4, 151 U.S.App.D.C. at 237, 466 F.2d at 408. See also H.R. Rep. No. 1621, 86th Cong. 2d Sess. (1960): "Section 6(a)(3) specifies certain functions which the Commission shall take into account in administering its ratemaking powers."

The requirement that an agency promulgating public utility rates take into account the efficiency of the utility's management is a common one. See, e. g., Mountain States Tel. & Tel. Co., 82 P.U.R. (n. s.) 46, 49 (Ariz.Corp.Comm'n 1949); United Fuel Gas Co., 46 P.U.R. 3d 118, 123 (W.Va.Pub.Serv.Comm'n 1962). The question of efficiency of management is often closely connected with the question of adequacy of service. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, supra note 4, 151 U.S.App.D.C. at 230–232, 466 F.2d at 401–403, and cases there cited; Western Light & Tel. Co., 17 P.U.R.3d 422, 428–430 (Okla.Corp. Comm'n 1957); E. Nichols & F. Welch, Rate of Return, chs. 20, 21 (1955 and Supp. A 1964).

134. The section of the Commission's opinion entitled "The Return to be Allowed," in Order No. 1052, supra note 1, 85 P.U.R.3d at 14–18, does not mention efficiency of management at all.

135. Supra note 4.

136. D.C. Transit Sys., Inc. (Order No. 1216), supra note 132.

137. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, supra note 4, 151 U.S.App.D.C. at 227, 466 F.2d at 398.

138. See id. at 401.

139. See id. at 403.

140. See id. at 403–404.

141. Id. at 423.

142. See text supra at note 129.

be "eminently correct," [143] and we went on to state that

> The parties to the Compact could hardly have more plainly mandated the well settled principle that rate-making appropriately encompasses an examination and evaluation of the economy and efficiency of a public utility's operations and the adequacy of its service.[144]

Accordingly, we affirmed the power of the Commission to precondition a fare raise upon terms calculated to safeguard the public interest in the caliber of the transportation provided.[145]

■■■ In the instant cases, the failure of the staff and the protestants to produce evidence of mismanagement certainly does not support an assumption that Transit was efficiently managed, and that was too vital a matter to be simply assumed away.[146] The Compact placed an obligation upon the Commission to develop the record on important matters when it was unsatisfied with the record produced by the parties. The Commission, like other agencies charged with the protection of the public interest, was not created simply to "provide a forum for the" proceeding.[147] The Commission was not at liberty to sit back and place "the responsibility for initiating or carrying through essential inquiries" on "private parties;" [148] instead, it had "an affirmative duty to assist the development of a meaningful record." [149] "[T]he Commission's primary *raison d'etre* is furtherance of the public inter-

est," we have said; [150] and it could not fulfill that function if it did not assure, by its own efforts, that its decision would be based on a full record.

■■■ We do not mean to suggest that the Commission could not rely on its staff. It certainly was not required that the Commission employ the services of a consulting firm every time it made an examination of Transit's efficiency. But the Commission could not base a decision on the silence of either the staff or the protestants, especially where there was no indication that anyone's attention was directed to the question at hand. The fact of the matter is that the staff in this very proceeding brought to the Commission's attention certain matters bearing upon Transit's efficiency. For instance, on the staff's suggestion, the Commission disallowed some executive salary increases,[151] and reinstated its previous command that Transit purchase new buses.[152] And the staff also pointed to a number of serious service problems, which the Commission commented upon.[153] But this was not the same thing as an inquiry directed to the staff concerning the efficiency of Transit's management. Such an inquiry presumably would have brought a response which, for example, could have pointed to innovations which Transit had or had not made to reduce expenses or to increase revenues. Once this sort of evidence was in the record, the Commission could rationally have taken Transit's efficiency into account in setting fares.

143. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 237, 466 F.2d at 408.

144. *Id.* (footnotes omitted.).

145. *Id.* at 412–413.

146. *Cf.* Washington Gas Light Co. v. Baker, *supra* note 108, 88 U.S.App.D.C. at 120–121, 118 F.2d at 16–17.

147. Office of Communications of United Church of Christ v. FCC, 138 U.S.App. D.C. 112, 116, 425 F.2d 543, 547 (1969).

148. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 7, 134

U.S.App.D.C. at 342 n. 106, 415 F.2d at 922 n. 106.

149. Office of Communications of United Church of Christ v. FCC, *supra* note 147, 138 U.S.App.D.C. at 117, 425 F.2d at 548.

150. Yohalem v. Washington Metropolitan Area Transit Comm'n, 141 U.S.App.D.C. 17, 22, 436 F.2d 171, 176 (1970).

151. See D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 13.

152. *Id.* at 12.

153. *Id.* at 28–29.

In short, while the Commission, of course, could have depended on its staff for this task, it still should have put the evidence on which it relied into the record and provided a sufficient articulation of its views for us to discern "the path which it followed" [154] to its conclusion about a just and reasonable return.

We will add, though it hardly seems necessary, that Transit bore a large share of the unfulfilled responsibility for producing a record on which findings as to its efficiency could have been made. Indeed, this should have been clear to Transit since its very first fare case, where the Public Utilities Commission, predecessor to the respondent Commission, said:

It is the opinion of the commission that when the earnings position of a public utility necessitates an increase in rates, that such position requires proof of economical management as well as provident control of expenditures.[155]

Of all the parties, Transit, of course, was in the best position to present facts which might have demonstrated the efficiency of its management, yet it hardly met that sort of standard.[156]

The Commission's failure to assure that an adequate record was prepared, and to give explicit consideration in setting rates to Transit's efficiency, is particularly disturbing because that was a matter which went to the heart of the Commission's duty. Like all public utility regulators, the Commission was designed to provide a substitute for competition for a monopoly affected with the public interest.[157] If the Commission had performed its task well, the company would have made a reasonable profit, not a monopoly profit, and resource allocation would not have been distorted.[158] But the Commission was not a substitute for competition unless it inquired into efficiency, for in a competitive market only an efficient company could make a reasonable profit.[159] If the Commission refused to perform its statutory duty to make such an inquiry, then Transit had no incentive to discover and utilize cost-saving devices.[160]

154. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L. Ed. 1206 (1945).

155. D.C. Transit Sys., Inc. (Order No. 4480), 25 P.U.R.3d 371, 378 (D.C.Pub. Utils.Comm'n 1958).

156. Transit pointed to the testimony of its vice presidents as evidence of its efficient management. The most significant statement was that by its senior vice president who,. when asked by Transit's counsel to comment on the company's operations, replied:

D.C. Transit's efficiency has been favorably recognized throughout the transportation industry for many years.

. . .

D.C. Transit has consistently been granted the nationally known Maintenance Efficiency Award each year without exception since 1958 and we have been advised that this honor will again be accorded to the Company for the year 1969. . . .

Appendix of Respondent-Intervenor at 25. The Commission nonetheless found that "[t]here is no question that the company's maintenance program has been deficient. . . ." D.C. Transit Sys., Inc. (Order No. 1052), supra note 1, 85 P.U.R.3d at 11.

Transit also brought to light some other evidence which, it says, bears on efficiency —for example, its proposed use of computers for routing and its method of utilizing drivers whose contracts guarantee an eight-hour day. But by any reasonable measure Transit's showing was substandard, and in any event it was for the Commission, not this court, to evaluate the evidence and to take Transit's efficiency into consideration in setting fares.

157. See J. Bonbright, Principles of Public Utility Rates 25 (1960), which points out that the very objective of regulation is "to serve as a substitute for competition." See also Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 226, 399 F.2d 953, 959 (1968).

158. See Northern Natural Gas Co. v. FPC, supra note 157, 130 U.S.App.D.C. at 226, 399 F.2d at 959.

159. E. g., Northern Pac. Ry. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

160. This is particularly true for Transit, since under its franchise, Pub.L. No. 757,

The alternative to an inquiry into efficiency, then, was to turn Transit into a high-cost plus company, and that plainly was not in the public interest.

We note, in this connection, that some serious questions about Transit's efficiency were raised. For example, petitioners point out, and we had previously noted,[161] that one of Transit's chronic problems was cash flow, a matter which the Commission had regularly considered in raising rates.[162] But there was no inquiry here, so far as we are aware, into methods, other than a fare increase, which Transit might have employed to eliminate this problem. Thus while the Commission assumed for ratemaking purposes that Transit had been paid the value of services it performed for a related corporation,[163] it never addressed the question whether an efficient management with a cash flow problem would have let the debt remain uncollected. As another example, it is alleged that Transit had the highest operating costs per mile among a group of major urban transportation companies.[164] If this is true, it raised obvious questions about efficiency. To take a third example, the Commission stated that Transit's "maintenance program has been deficient and that, as a result, the number of buses available for service has been inadequate." [165] But this inadequacy did not spark an inquiry into management's efficiency, nor did it have any apparent effect on the rate of return allowed.[166] Finally, and without trying to be exhaustive, we note that while the Commission thought it "crystal clear . . . that the financial problem of the company is due to a declining ridership and increasing labor costs," [167] it made no investigation into what the company was doing to increase ridership,[168] or to reduce labor costs.

In sum, the Commission, in allowing the increase here, fell far short of what it later claimed in Order No. 1216 to be the required degree of concern with Transit's efficiency of management.[169] While we commended the improvement

70 Stat. 598 (1956), and under Section 6(a)(4) of the Compact, *supra* note 4, the "primary test of the reasonableness of Transit's fares" is the "operating ratio method." D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 108, 121 U.S.App. D.C. at 400, 350 F.2d at 778. Thus if Transit's costs of service rose avoidably, any given operating ratio resulted in higher-than-necessary fares—provided, of course, it was not caught by the Commission and that the Commission did not deem the fares too high.

161. Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 150, 141 U.S.App.D.C. at 27, 436 F.2d at 181.

162. See, *e. g.*, D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R. 3d at 16.

163. See D.C. Transit Sys., Inc. (Order No. 773), 72 P.U.R.3d 113, 124 (1968), rev'd, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59. The amount in question—some $23,400 a year—is a "conservative" estimate of the value to the *D.C. Examiner*, a newspaper owned by the principals of Transit, of the space on its buses that Transit made available for distribution of the paper. *Id.*

164. Brief for petitioner Democratic Central Committee at 15, relying on Exhibits 5-7 in Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 7.

165. D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 11.

166. See note 130, *supra*.

167. D.C. Transit Sys., Inc. (Order No. 1057), *supra* note 47, 85 P.U.R.3d at 37.

168. Indeed, the Commission took it upon itself to remedy "the inadequacy of the company's marketing program" by ordering "a soundly conceived and well-carried out program of imparting information to riders and potential riders about the specifics of the company's service. . . ." D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 23-24. Significantly, the Commission commented that it "believe[d] that [Transit's] efforts to maintain its existing ridership and to obtain new ridership have been impaired by its failure to promote adequately the use of its service." *Id.* at 23.

169. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4.

in the Commission's study of Transit's efficiency in Order No. 1216,[170] that cannot save the inadequate showing in Order No. 1052, which, together with other defects,[171] vitiates the fares set by that order.

## IV. VIABILITY OF TRANSIT'S BUSINESS

We must now consider the final argument challenging the validity of Order No. 1052—the argument that the Commission, in granting Transit the increases permitted by that order, acted on the erroneous premise that a public utility is entitled to a return on its investment although its fiscal status may be so precarious that it would be unlikely to obtain any return if it were forced to compete on the open market.

Braided into Order No. 1052 is the cardinal assumption that the case law,[172] the Compact,[173] the Franchise Act,[174] and particularly the Constitution,[175] required the Commission to set the fares at a level which would insure Transit an adequate return after costs and expenses. Amicus curiae and the District of Columbia challenge this postulate. Since both the Compact and the Franchise Act demand, in addition to efficient and economical service, that Transit's rates remain reasonable,[176] and since a rash of

recent fare increases has failed to solve Transit's financial plight,[177] it was error, they claim, for the Commission to grant another increase without a separate, prior determination as to whether at any fare level Transit was capable of consistently earning a profit and attracting investment capital.

Amicus curiae has shouldered the burden of this facet of the cases and the argument he constructs can be sketched roughly as follows. From January, 1968, to June, 1970, Transit was allowed four fare increases, raising the basic District of Columbia cash fare from 25 cents to 40 cents [178]—an overall increase of 60 percent. If increases in such rapid succession and in such proportions were necessary to keep the company in business, it follows that a serious question existed as to whether the business was or could be made viable. It was improper, the argument continues, for the Commission to decline to investigate the cause of Transit's near-deficit operation, for such an investigation might have revealed that Transit was unable to maintain itself financially without an endless chain of fare elevations. In that event, the argument concludes, neither the Constitution, the Compact, the Franchise Act nor the case law would require or justify the increase in question; on the contrary, an unreasonable burden would

170. *Id.* at 244–245, 466 F.2d at 415–416.

171. See Part II, *supra,* and Part IV, *infra.* See also text *supra* at note 131.

172. The Commission concluded that to compel Transit to operate without income sufficient to cover operating expenses and debt service as well as a return sufficient to attract investment capital "is to confiscate its property without due process of law." D.C. Transit Sys., Inc. (Order No. 1057), *supra* note 47, 85 P.U.R.3d at 36, citing Bluefield Water Works & Improvement Co. v. West Virginia Pub. Serv. Comm'n, 262 U.S. 679, 690, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

173. *Supra* note 4.

174. Pub.L.No.84–757, 70 Stat. 598 (1956).

175. See note 172, *supra.*

176. Compact, *supra* note 4, tit. II, art. XII, §§ 3, 6(a).

177. See text *infra* at note 178.

178. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 163, aff'd in part, Powell v. Washington Metropolitan Area Transit Comm'n, *supra* note 68, rev'd, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59; D. C. Transit Sys., Inc. (Order No. 880), *supra* note 30, supplemented, D.C. Transit Sys., Inc. (Order No. 882) (WMATC Oct. 29, 1968), aff'd, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 7; D.C. Transit Sys., Inc. (Order No. 984), *supra* note 22, rev'd, D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. ——, 485 F.2d 881 (1973); D.C. Transit Sys., Inc. (Order No. 1052), *supra* note 1.

fall on farepayers if fares were set at an artificially high level only to theoretically provide a return to the company. For precedent to support this position, amicus draws heavily on the Supreme Court's decision in Market Street Railway Company v. Railroad Commission.[179]

It is clear from the terms of the Compact[180] and the Franchise Act[181] that there are at least some circumstances in which Transit would not necessarily be entitled to an adequate return after costs and expenses. Section 6(a)(1) of the Compact requires the Commission, in deciding whether to suspend a fare change, to give consideration, among other things, to "whether the carrier is being operated economically and efficiently."[182] Section 6(a)(3) provides that, in prescribing just and reasonable fares, the agency shall take into account, *inter alia*, "the need, in the

public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service," as well as "the need of revenue sufficient to enable [the] carrier[ ] under honest, economical, and efficient management, to provide such service."[183] Similarly, Section 4 of the Franchise Act, promises that "if [Transit] does provide the Washington Metropolitan Area with a good public transportation system, with reasonable rates, Congress will maintain a continuing interest in the welfare of the Corporation [Transit] and its investors."[184] It follows from these of return contemplated by the Compact portions of the Compact and the Franchise Act that, if Transit were not run economically, efficiently, and honestly, then it would not be entitled to the level and Franchise Act.[185] This much is

179. *Supra* note 3.

180. *Supra* note 4.

181. Pub.L.No.84–757, 70 Stat. 598 (1956).

182. The Compact, *supra* note 4, provides in relevant part at tit. II, art. XII, § 6 (a)(1), that:

The Commission, upon complaint or upon its own initiative, may suspend any fare, regulation, or practice shown in a tariff filed with it under Section 5 . . ., at any time before such fare, regulation, or practice would otherwise take effect. . . . In determining whether any proposed change shall be suspended, the Commission shall give consideration to, among other things, the financial condition of the carrier, its revenue requirements, and whether the carrier is being operated economically and efficiently. . . .

183. Section 6(a)(3) is quoted in text *supra* at note 129.

184. Franchise Act, Pub.L.No.84–757, 70 Stat. 598, 599 (1956), tit. I, pt. I, § 4, provides:

It is hereby declared as matter of legislative policy that in order to assure the Washington Metropolitan Area of an adequate transportation system operating as a private enterprise, the Corporation [Transit], in accordance with standards and rules prescribed by the Commission, should be afforded the opportunity of earning such return as to make the Corporation an attractive

investment to private investors. As an incident thereto the Congress finds that the opportunity to earn a return of at least 6½ per centum net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on either the system rate base or on gross operating revenues would not be unreasonable, and that the Commission should encourage and facilitate the shifting to such gross operating revenue base as promptly as possible and as conditions warrant; and if conditions warrant not later than August 15, 1958. It is further declared as a matter of legislative policy that if the Corporation does provide the Washington Metropolitan Area with a good public transportation system, with reasonable rates, the Congress will maintain a continuing interest in the welfare of the Corporation and its investors.

185. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 236–242, 247–252, 466 F.2d at 407–413, 418–423. See also Part III, *supra*. This principle had been recognized by District of Columbia regulatory agencies on at least two occasions prior to promulgation of Order No. 1052. In D.C. Transit Sys., Inc. (Order No. 984), *supra* note 22, the Commission warned that a return to investors would be withheld if service deficiencies were not improved:

We also would put Transit on notice that in any future rate case if the level

contested neither by the Commission nor by Transit.

The Franchise Act couples the continued interest of Congress in the company to the provision of "a good transportation system," [186] as well as the operation of such a system at "reasonable rates."[187] It would appear that to Congress it was important not only that the transit system be good—honest, efficient, and economical—but also that the rates be reasonable in themselves.[188] The Franchise Act also states that Transit "should be afforded the opportunity of earning such return as to make the Corporation an attractive investment to private investors." [189] This suggests, not a guarantee of a good return, but an opening to Transit to make such a return if it could. Section 6(a)(4) of the Compact contains a similar statement, and the same implication as to the "opportunity of earning such return as to make the carriers attractive investments to private investors." [190]

These clauses of the Franchise Act and the Compact seem to us to embody principles not essentially dissimilar from those which found Supreme Court approval in Market Street Railway Company v. Railroad Commission.[191] In *Market Street*, the Court upheld as non-confiscatory a fare which would not return a profit to the utility but would permit a return on the worth of the company's property valued at the price at which Market Street had agreed to sell the company to the City of San Francisco. The company's history was that of a failing enterprise to which a prior fare increase had brought, not additional revenues, but instead a steady decline in traffic; and the Court's opinion clearly distinguished between utilities which were financially healthy and those that were sick. It pointed out that

. . . most of our cases deal with utilities which had earning opportunities, and public regulation curtailed earnings otherwise possible. But if there were no public regulation at all, this appellant [Market Street] would be a particularly ailing unit of a generally sick industry. The problem of reconciling the patrons' needs and the investors' rights in an enterprise that has passed its zenith of opportunity and usefulness, whose investment already is impaired by economic forces, and whose earning possibilities are al-

---

of service is allowed to drop below that required by the compact, the commission will consider denying any return to the equity holder so long as that condition exists. 81 P.U.R.3d at 455. And on an earlier occasion, the District of Columbia Public Utilities Commission pointed to improvident expenditures and indicated that it was setting rates as if Transit were operating efficiently. D.C. Transit Sys., Inc. (Order No. 4480), *supra* note 155, 25 P. U.R.3d at 378.

186. Pub.L. No. 84–757, 70 Stat. 598–99 (1956), tit. I, pt. I, § 4, quoted *supra* note 184.

187. *Id.*

188. Like other regulatory bodies, the Commission was required to balance the interests of both the consumer and the investor. The scheme presented in the Franchise Act and the Compact recognized this balance. If Transit was efficient, it was to be permitted a fair return. If it was not efficient—that is, if it did not provide good service at a reasonaby low cost—then it might be denied a return, or one which otherwise would have been higher. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 236–239, 446 F.2d at 407–410; Washington Gas Light Co. v. Baker, *supra* note 108, 88 U.S.App.D.C. at 119, 188 F.2d at 15; Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), 390 U.S. 747, 769–770, 790–798, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 610, 612, 64 S.Ct. 281, 88 L.Ed. 333 (1945); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 606–608, 62 S.Ct. 736, 86 L.Ed. 1037 (1942) (concurring opinion).

189. Pub.L. No. 84–757, 70 Stat. 598, § 4 (1956), quoted *supra* note 184.

190. Compact, *supra* note 4, tit. II, art. XII, § 6(a)(4), quoted *supra* note 49.

191. *Supra* note 3.

ready invaded by competition from other forms of transportation, is quite a different problem.[192]

And, the Court reiterated, "[i]t is idle to discuss holdings of cases or to distinguish quotations of this or other courts which have dealt with utilities whose economic situation would yield a permanent profit, denied or limited only by public regulation."[193] The considerations advanced in Federal Power Commission v. Hope Natural Gas Company,[194] the Court observed,

> . . . concerned a company which had advantage of an economic position which promised to yield what was held to be an excessive return on its investment and on its securities. They obviously are inapplicable to a company whose financial integrity already is hopelessly undermined, which could not attract capital on any possible rate, and where investors recognize as lost a part of what they have put in. It was noted in the *Hope Natural Gas* case that regulation does not assure that the regulated business make a profit. All that was held was that a company could not complain if the return which was allowed made it possible for the company to operate successfully. There was no suggestion that less might not be allowed when the amount allowed was all that the company could earn.[195]

Finally, the Court noted that the Constitution does not require a regulatory agency to fix rates "on an investment after it has vanished . . . or to maintain the credit of a concern whose securities already are impaired. The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces."[196]

*Market Street's* theme, in short, is that there is no requirement that regulation be used to bolster and make profitable a company which would not otherwise be successful. That is the principle which the Commission should have followed, but did not. We do not say that, in actual fact, the circumstances of Market Street Railway were those of Transit. What we do say is that there certainly were sufficient indications that Transit might have been ailing to have alerted the Commission to have investigated (a) if and to what extent the company would have been able to make a profit if there were no regulation at all, and (b) if and to what extent Transit could then earn a sufficient return so as to make it an attractive investment at any level of fares which could have been deemed "reasonable."

We do not think it can be said, under the Compact and the Franchise Act, that any fare was "reasonable" no matter how high it was or how few riders were able to pay the fare, so long as Transit was able to show a technical excess of gross income over expenses.[197] As we pointed out above, the Franchise Act stipulates "a good transportation system" as well as "reasonable rates";[198] the fact that the system was "good" did not automatically endow with reasonableness any fares necessary to sustain that good system at a profit. Reasonableness entails a consideration of the value of the service to the riders, the numbers who can use the service at the fares set, and the burden of those fares upon the riding public or important segments of it. Similarly, in appraising whether an operation is

---

192. 324 U.S. at 554, 65 S.Ct. at 774.

193. Id. at 566, 65 S.Ct. at 779.

194. *Supra* note 188.

195. 324 U.S. at 566, 65 S.Ct. at 779 (citations omitted).

196. *Id.*, at 567, 65 S.Ct. at 780.

197. We do not mean to imply that to be reasonable a fare must necessarily be within everyone's budget. See Powell v. Washington Metropolitan Area Transit Comm'n, *supra* note 68, 158 U.S.App.D.C. at — – —, 485 F.2d at 1083–1085.

198. See text *supra* at notes 186–187.

economical,[199] account must also be taken of the relationship between the level of the fares and the worth of services rendered to the riders. Service is not economical simply because it is honest, mechanically efficient, and as thrifty as it can be under the circumstances; it is not economical if the charge for the service must be set at inordinately high levels in order for the transit company to obtain a profit.[200]

The record in these cases shows that ridership has declined considerably as the fares have risen.[201] In Order No. 1052, the Commission estimated that the decline would continue with the new fare raise to 40 cents.[202] Since 1966, the trends toward higher fares and lower ridership have been both steady and rapid.[203] The fall in ridership has borne, of course, most heavily on the poor and those who neither have the use of automobiles nor can well afford taxis.

■ The Commission has made a most conscientious effort to set Transit's fares at the proper level, and its task has been a most difficult and complex one. But we cannot avoid concluding that, performing its burdensome function, the agency has throughout acted on the erroneous postulate that it was compelled—no matter to what level it must raise the fares, how substantial the fall in ridership, and how financially sick Transit might be—to set the fares so that Transit could always earn a profit. To be sure, Transit was entitled to a reasonable opportunity to earn a fair return from its operations.[204] It was not, however, for the Commission to insure a return. Neither the Compact[205] nor the Franchise Act[206] authorized a guarantee, nor did due process require it[207] nor, as the cases make plain, was it the Commission's pre-

199. See Compact, *supra* note 4, tit. II, art. XII, §§ 6(a)(1), 6(a)(3), quoted *supra* note 182 and text *supra* at note 129, respectively.

200. Key Sys. Transit Lines, 17 P.U.R.3d 505 (Cal.Pub.Utils.Comm'n 1957) is but another variation of this approach. There the transit company refused to adopt and effectuate an improved transportation system designed to save operating expenses and to yield a 9.11% rate of return. In refusing to implement the new system, the company was "unlawfully denying to itself a reasonable opportunity to earn a fair return upon its property reasonably devoted to public use," *Id.* at 509, and the Commission felt no constitutional compulsion to relieve the company from its 2.7% return.

201. That was quite expectable, owing to the phenomenon in ratemaking known as the "resistance factor." See Powell v. Washington Metropolitan Area Transit Comm'n, *supra* note 68, 158 U.S.App.D.C. at —— n. 17, 485 F.2d at 1083 n. 17 and accompanying text. This factor was discussed by the Commission in the proceeding under review. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 7–8.

202. *Id.* at 8.

203. From 1960 through 1967, when Transit's basic District of Columbia cash fare remained at a constant 25 cents, the total

number of revenue passengers changed from 134,925,430 in 1960 to 133,646,024 in 1967, with a high point of 137,771,403 in 1966 and a low point of 131,685,316 in 1963. S.Rep.No.91–760, 91st Cong., 2d Sess. 24–25. In 1970, on the basis of a 40-cent fare, the Commission projected the ridership at between 112,785,616 and 113,253,766. D. C. Transit Sys., Inc. (Order No. 1052), *supra* note 1, 85 P.U.R.3d at 8.

204. *E. g.*, Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n, 262 U.S. 276, 290–291, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (separate opinion). The return of which we speak would embrace, of course, reimbursement of all reasonable costs of providing the service and reasonable compensation for the public's use of the capital utilized in the enterprise.

205. See text *supra* at notes 182–90.

206. See text *supra* at notes 182–90.

207. Market Street Ry. v. Railway Comm'n, *supra* note 3, 324 U.S. at 566–567, 65 S.Ct. 770; FPC v. Hope Natural Gas Co., *supra* note 188, 320 U.S. at 603, 64 S.Ct. 281; FPC v. Natural Gas Pipeline Co., *supra* note 188, 315 U.S. at 590, 62 S.Ct. 736; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n, *supra* note 204, 262 U.S. at 291, 43 S.Ct. 544; See also D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 247–252, 466 F.2d at 418–423.

rogative to afford it.[208]  Though the Commission has also commented that it has considered the public interest in restraining the rise in fares, we are convinced that the incorrect postulate to which we have referred has initially infected the Commission's whole thinking and its ratemaking process.  Order No. 1052, in particular, cannot be judged apart from that mistaken premise, which we judge to be at its core.  For this reason, as well as for the others we discuss in this opinion,[209] that order cannot stand.

## V.  DISPOSITION

For three reasons we have concluded that Order No. 1052 is invalid.  First, the Commission should have credited to Transit's farepayers, to the extent not exhausted by its prior similar obligation,[210] the amount by which the company's lands increased in value up to the time they were removed from operating status.[211]  Second, in determining Transit's right to higher fares, the Commission should have inquired into the efficiency of Transit's management—a necessary prerequisite, under the terms of the Compact, to considering any fare raise.[212]  And finally, the Commission's decision should have been guided by the precept that Transit was entitled to an opportunity to earn a return on its investment but not to a guaranteed return, nor necessarily to a fare increase where an examination of its economic health could have revealed that it was incapable of maintaining profitable operations under any reasonable rate of return allowed.[213]

Given these infirmities in Order No. 1052, we are faced with the question of the disposition mandated.  Defective fare orders cannot be cured by retroactive ratemaking,[214] nor is the Commission in a position to promulgate any new fares for Transit in light of the recent public takeover of its transportation assets and operations.[215]  Nevertheless, we cannot give legal effect to the invalid fares set in Order No. 1052 by allowing that order to stand.[216]  As in *Democratic Central Committee*,[217] decided today, and as in its decisional forerunner, *Williams v. Washington Metropolitan Area Transit Commission*,[218] we find the appropriate avenue of relief here to be restitution.[219]

The Commission is in an excellent position, both by virtue of its administrative expertise and its familiarity with Transit's situation to conduct the investigations essential to ascertainment of restitution to be awarded here.  For that purpose, we remand the case to

---

208.  See cases cited *supra* note 207.

209.  See Parts II, III, *supra*.

210.  See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— - ——, 485 F.2d at 827, and text *supra* following note 84.

211.  See Part II, *supra*.

212.  See Part III, *supra*.

213.  See Part IV, *supra*.

214.  See cases cited *supra* note 126.

215.  See note 117, *supra*.

216.  Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— - ——, 485 F.2d at 824–825;  Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 75, 134 U.S.App.D.C. at 363, 415 F.2d at 943.

217.  *Supra* note 59, 158 U.S.App.D.C. at —— - ——, 485 F.2d at 824–826.

218.  *Supra* note 75, 134 U.S.App.D.C. at 362–364, 415 F.2d at 942–944.

219.  Order No. 1052, unlike the fare orders in *Democratic Central Committee* and *Williams*, has not been superseded by later orders.  But the granting of relief is, nevertheless, complicated by the recent public takeover of Transit's operations, see note 117, *supra*, and the consequent termination of the Commission's faresetting duties.  See Compact, *supra* note 4, tit. III, art. IX, § 41, art. XIII, § 60;  Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —— - ——, 485 F.2d at 824–827.  Thus, as in *Democratic Central Committee* and *Williams*, restitution is the appropriate method of restoring to the riders any unlawful excess from fares collected under Order No. 1052.

the Commission.[220]  Necessarily, three matters, correlative to the three defects we have found in Order No. 1052, must be explored by the Commission. The first is the amount of the increase in market value over book value of lands which Transit moved below the line prior to the issuance of Order No. 1052,[221] and the amount of the increase remaining after the application to be made in *Democratic Central Committee.*[222]  This is perhaps the least difficult of the three assignments since it involves essentially the same calculations required of the Commission by our opinions today in *Democratic Central Committee*[223] and *Bebchick.*[224]

Once ascertained, the net amount of this value-appreciation must be credited to the farepayers. The specific means by which the riders are to be benefited thereby must also be worked out by the Commission, preferably in consultation with the Washington Metropolitan Area Transit Authority, the new owner of Transit's system.[225]

The other two matters which the Commission must look into relate to remedying the other two defects in Order No. 1052. One is the determination of the impact, if any, which the efficiency of Transit's management should have had on its right to fare increases at the time of the order.[226]  The other is the evaluation, which *Market Street Railway*[227] required, as to whether Transit's then financial position would have enabled it to consistently maintain a profitable mass transportation system under any rate of return.[228]

The Commission has the benefit now of the Loconto report[229] and the other evidence adduced in the hearings on Order No. 1216[230]—evidence which convinced the Commission that Transit was operating inefficiently and under perilous economic circumstances two years after the faresetting in Order No. 1052.[231] The Commission is free to draw upon these sources for such assistance as they may afford in the performance of these duties on remand.

It is conceivable that after reconstructing Transit's situation at the time of Order No. 1052, and after applying itself to the factors which we have found that it neglected, the Commission might nevertheless conclude that Transit's request for higher fares was properly granted. In that event, the only infirmity in Order No. 1052 having any practical effect would be the failure to benefit the riders by the increased mar-

220. Compare Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S.App.D.C. at —– – —–, 485 F.2d at 826–827.

221. See Part II, *supra.*

222. *Supra* note 59, at —–, 485 F.2d at 827, See text *supra* following note 84.

223. *Supra* note 59, at —–, 485 F.2d at 827.

224. *Supra* note 78, 158 U.S.App.D.C. at —– – —–, 485 F.2d at 804–805.

225. See note 117, *supra.* This is the procedure we suggested in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 59, 158 U.S. App.D.C. at —–, 485 F.2d at 828.

226. See Part III, *supra.*

227. *Supra* note 3.

228. See Part IV, *supra.*

229. See Part III, *supra*, at notes 136–139; D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 227–230, 466 F.2d at 398–401.

230. See D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 230–232, 466 F.2d at 401–403.

231. *Id.*

ket value of the lands moved below the line. That would be handled as we have suggested above and in *Democratic Central Committee.*[232]

Order No. 1052 is set aside. The case is remanded to the Commission for further proceedings consistent with this opinion. Our jurisdiction over the case is retained in full.

So ordered.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

For the reasons set out in my opinion in today's companion case, *Democratic Central Committee* v. *WMATC,* No. 21865, 158 U.S.App.D.C. ——, 485 F.2d 786 (hereinafter No. 21865), I concur generally in this decision, dissenting only from Part II (and Part V insofar as it necessarily directs the Commission to remedy the alleged defects delineated in Part II).

I would just like to add that it seems odd that the majority in this case manages to find some sort of "implicit" legislative intent in the Franchise Act (granting Transit its charter) that mandates the result reached. This intent is apparently derived from Congress' total silence on the subject which the majority interprets as meaning that Congress could not have intended any result other than that reached in this case. It is argued, *supra* at 898, 902, that nothing in the Act suggested that gain

should accrue to the investors. Yet since that would have been the result absent any provision to the contrary, Congress' silence on the matter would seem infinitely more supportive of an implicit acquiescence in awarding the gain to the investors rather than the converse as argued by the majority, *supra* at 902. This strikes me as a very weak strut to support the logic of the majority's decision and is really nothing more than a restatement of the view that the history and circumstances of Transit are such that it would be desirable to award any and all gains to the farepayers. Here the majority seeks to clothe its basic equitable arguments in the garb of congressional intent. As an indication of a desperate need to lend some legal substance to its vague equitable leanings, this tactic serves only to weaken the majority's position, rather than strengthen it.

Transit was taken over by the public authorities on January 14, 1973 and the operating officials are already considering demands for fare increases in order to meet operating expenses. This is some indication that the past management was perhaps not as inefficient as has been contended and that the fare increases sought by Transit from time to time over the years were not as unreasonable as their opponents contended. In fact, local fares were generally not out of line with bus fares nationally. For the record there is appended in the margin fares in other comparable urban areas. (Exhibit 14, p. 1).

---

**232.** *Supra* note 59, 158 U.S.App.D.C. at —— – ——, 485 F.2d at 827–828.

CASH FARES, TRANSFERS AND MAXIMUM FARES IN 46
LARGEST U.S. AND CANADIAN CITIES
*(SOURCE: A.T.A. FARE SUMMARY BOOKLET)*

| City | Cash Fare | Tickets or Tokens | Trans-fer | Maximum Fare Within City Incl. Transfer | Owner-ship |
|---|---|---|---|---|---|
| Kansas City, Missouri | $.50 | None | $.05 | $.65 | Public |
| Akron, Ohio | .40 | 5/$1.75 | .02 | .42 | Private |
| Chicago, Illinois | .40 | None | .05 | .45 | Public |
| St. Louis, Missouri | .40 | None | .05 | .45 | Public |
| Atlanta, Georgia | .35 | 3/$.90 | .05 | .40 | Private |
| Cincinnati, Ohio | .35 | 5/$1.50 | .10 | .55 | Private |
| Cleveland, Ohio | .35 | 5/$1.75 | .05 | .40 | Public |
| Denver, Colorado | .35 | None | .05 | .40 | Private |
| Houston, Texas | .35 | 10/$3.00 | Free | .55 | Private |
| Louisville, Kentucky | .35 | 10/$3.50 | .05 | .40 | Private |
| Montreal, Canada | .35 | 3/$.90 | Free | .35 | Public |
| Pittsburgh, Pennsylvania | .35 | None | .05 | .45 | Public |
| Portland, Oregon | .35 | None | Free | .35 | Private |
| Toledo, Ohio | .35 | 5/$1.75 | .05 | .55 | Private |
| Baltimore, Maryland | .30 | .30 | .05 | .35 | Private |
| Birmingham, Alabama | .30 | 20/$5.50 | .05 | .55 | Private |
| Buffalo, New York | .30 | 10/$3.00 | .05 | .35 | Private |
| Columbus, Ohio | .30 | 5/$1.50 | Free | .30 | Private |
| Dallas, Texas | .30 | None | Free | .70 | Public |
| Detroit, Michigan | .30 | 7/$2.00 | .05 | .35 | Public |
| Fort Worth, Texas | .30 | 8/$2.00 | .02 | .37 | Private |
| Indianapolis, Indiana | .30 | None | .05 | .35 | Private |
| Los Angeles, California | .30 | .30 | .05 | * | Public |
| Memphis, Tennessee | .30 | None | .05 | .35 | Public |
| Milwaukee, Wisconsin | .30 | 10/$2.75 | Free | .40 | Private |
| New York, New York (C) | .30 | .30 | Free | .55 | Public |
| Oklahoma City, Oklahoma | .30 | None | Free | .40 | Public |
| Omaha, Nebraska | .30 | 36/$9.00 | .02 | .32 | Private |
| Phoenix, Arizona | .30 | None | .05 | .45 | Private |
| Philadelphia, Pennsylvania | .30 | None | .05# | .47 | Public |
| San Diego, California | .30 | 4/$1.00 | Free | .30 | Public |
| Toronto, Canada | .30 | 4/$1.00 | Free | .60 | Public |
| Honolulu, Hawaii | .25 | 5/$1.00 | Free | .35 | Private |
| Long Beach, California | .25 | 5/$1.00 | Free | .32 | Public |
| Miami, Florida | .25 | None | Free | .25 | Public |
| Minneapolis-St. Paul, Minn. | .25 | None | Free | .25 | Private |
| Newark, New Jersey | .25 | None | .10-.20 | ** | Private |
| New York, New York (A) | .25 | None | Free | .55 | Private |
| New York, New York (B) | .25 | None | Free | .55 | Private |
| Norfolk, Virginia | .25 | 10/$2.25 | Free | .40 | Private |
| Oakland, California | .25 | 4/$1.00 | Free | .35 | Public |
| Rochester, New York | .25 | 8/$2.00 | .02 | .27 | Public |
| San Antonio, Texas | .25 | None | .02 | .40 | Public |
| Seattle, Washington | .25 | .25 | Free | .45 | Public |
| Boston, Massachusetts | .20 | .20 | None | .20@ | Public |